here last in 2020-277 Snyder v. Commissioner of Social Security. Good morning, is it Mr. Cortley? It is. And you've reserved three minutes for rebuttal whenever you're ready. I did. Thank you. May it please the Court. I am Peter Gorton. I'm the attorney for the appellant. And the question in this case, it is a, of course, a social security disability case. And in this particular case, it's a very defined period, about a year and a half. The real question in the case, and I refer a lot to the brief of the government, is whether or not the claimant had a total disability. And if that is the issue before the court, I take my papers, I walk out, because she did not. This is the question before the court. The administrative law judge found she could not do her prior relevant work and consequently was entitled to benefits if there were not a significant number of jobs. The vocational expert gave two jobs that she could do, but said neither one had a significant number of jobs if one or two things happened. One, she was off task while doing the job for 10% of the day. Two, she was absent one day per month during this period. And the fact of the matter is that she was actually off, she was actually absent much more than a month, one day a month, even before she finally said enough and she couldn't work anymore. The situational stressors at home, et cetera, she couldn't deal with them. I could have. Counsel probably could have. Maybe you could have. That's not the issue. The issue is whether she could have. And we set forth in the brief that since childhood, she had issues that were subject to being made worse because she could not handle these issues. And so for that year and a half, she could not. It is both psychiatric and because of partly of the psychiatric problems and partly otherwise, she has migraine headaches. It is set forth in our brief. I can go through each one. I actually wrote them all down. But it is set forth in our brief during this entire period that she had very significant psychiatric problems. There were times that she said they're a little bit better. But that doesn't mean anything. The question is not whether they're a little bit better. I mean, look at the poor Buffalo player who was taken off and they thought he was going to die. And then finally he wasn't and everybody was celebrating. He's on an oxygen. He was better. But that doesn't mean anything. It's never a question of whether she's better. Throughout the period, she had migraine headaches and the emotional problems, which were together and which clearly made that she could not. Weren't the migraine headaches associated with the stress of the job that she had? No. We understand that to be the argument of the government, but it's not. And we set forth in there that the other job and the headaches seem to have at least abated. No. Well, obviously her life situation and they did get a little bit better during the year after she took off, but also it was more, it was less the, and let me get it for you. When you talk about her life situation, what are you talking about? What factors? Well, her family and throughout, that's the biggest problem is that which all of us could handle. She could not. She had family issues. They stressed her to the point that she couldn't work. They stressed her to the point that she got these migraine headaches. But there also is evidence. There's a head brain MRI. It's transcript 312, 313. And forgive me, I'm not a neurologist. But five and ten inch foray at the gray-white matter junction of each lobe coming from several things, but among others migraines. So there is also, and that's T312, 313, and it's in our brief. But no, it's other stressors as well. And those include feeling overwhelmed and emotionally numb. Oh, forgive me. Sorry, Judge. It's hard. Highly stressed with various issues concerning herself and her family, children and parents, 505-595-11513. Decreased energy and anxiety. Irritability worsened to 45. Continues to experience numerous stressors. There's really only one. There's only, in the entire record, and we set it forth in the brief, there's only one mention of the fact that the job was one of the stressors. And even nurse practitioner Irwin, and they wrote a great brief, the government, they point to that. But she did not say if she got a better job that she could, the nurse practitioner Irwin is a lady, did not say that the claimant could work without absences or being off task if she got a different job. What she said is if she got a different job, she might be able to work if she had accommodations. Well, with accommodations, the vocational expert, there are no jobs. And if those accommodations included missing more than one day a month, there are no jobs. In fact, if you look at the evidence, you'll see that, first of all, in the months before she quit, her absenteeism was over a day a month, but, you know, she would borrow from other people and the employer didn't fire her. But she would have actually been entitled, but she continued to work. Counsel, may I ask on the ALJ's treatment of, I think it was Dr. Slowick and the nurse practitioner, their testimony or their evidence regarding the absences and the off-task behaviors, I think the ALJ concluded that it was speculative. And isn't that sort of classically an ALJ's weighing and credibility and the like? We absolutely would disagree. There are three things in terms of a social security case. First is listings. Listing is very objective. There's no speculation. There's no nothing. You either, you know, 45% ejection fraction on the heart and on and on and on. And you either do or you don't. When you get into whether you can do sedentary work, light work, it is speculative. I mean, you can ask any doctor. Doctor, point me to the one thing in this record that says that the person can lift 10 pounds. They can't. It's you look at this, you look at this, you look at this, you jumble it all together, and my opinion is 10 pounds. No different with off-task and absenteeism. The nurse practitioner has seen this claimant over and over and over and over again. And those are good arguments. And I should say it wasn't just that the ALJ concluded it was speculative and contradicted by other evidence. And, again, that's the fact finder's task. And so I think, I mean, our reviewing of that assessment just puts this in a different position. And our argument would be a couple things. One is it's one thing if the claimant's providers say she's going to have some off-task and absenteeism and the defendants say she won't. That's not what happened here. What happened here is everybody agrees there is at least, at least, Dr. Sloack, who is the government's consultant, says marked diminishment of ability to maintain schedule. One day a month, it's marked. But even their non-examiner and the most recent cases, the published case of Colgan and Rucker and the 25-page but non-published decision of Anna Claudio-Montanez that was just decided a month and a half ago. I got the cite if you want it. I should have done a frat of another letter, but decided December 20. They all say that the non-examiner does not constitute substantial evidence. But even if it did, he says moderate limitation to being able to maintain a schedule. Here's what moderate does not mean. Nothing. It does not. You've got nothing. You've got mild. You've got moderate. You've got marked. On maintaining a schedule, he says moderate. The judge says zero. No diminishment in the ability to stay on task, off task. You've got claimant sources saying marked, three or more absences, more than 15%. You've got Dr. Slowack, who is the government's own consultant, who actually gets to see the claimant, who says marked, which is certainly more than one. And then you've got the non-examiner who says moderate, which, again, in and of itself, would moderate do it? Probably not. But it's not contrary. So we're in the situation where we do not have overwhelmingly compelling evidence against every single ‑‑ so the judge is saying, okay, you, government witness, you said moderate. Government witness, you said marked. Claimant, you said marked. Nah, I disagree. That's substituting their opinion. And only you would ‑‑ Thank you. We do understand your argument. Thank you. And you have time on rebuttal. We'll hear from Mr. Kaiser. May it please the court, Fergus Kaiser for the commissioner. So just stepping back for a second to take a broad look at this case. The central question here, as it is in all disability cases, is not whether the person can work one specific job, such as the job the appellant was working in 2016 and 2017 when she was experiencing all of these issues with absences. The issue is whether there are any jobs in the national economy that the person can perform. And an individual need not be completely free of limitations and impairments to be found not disabled. The person need only be found that they're capable of working despite these impairments and limitations they may have. And here, appellant, she was not capable of consistently performing the duties of that job she worked in 2016 and 2017. As noted by N.P. Erwin, who treated the appellant for her social emotional issues in a letter in 2017, this is at 697 of the record. She said her symptoms were exacerbated by high levels of stress. She experienced in her current position. And this was also echoed by Dr. Duenius, the neurologist who treated her migraines, who said in a letter in 2017, her migraines are exacerbated by the stress at her workplace. However, these both of these treating sources did not advocate for her removal from the workplace. They simply said she needs to be placed in a less stressful environment. They both said, like Erwin in the 2017 letter, transfer to a less critical, less stressful position. Duenius said just transfer to a different position. And here the ALJ agreed with both of these treating sources, finding that, yes, indeed, plaintiff was not able to work in a high stress environment, but she could work in a less stressful environment. And in a very detailed 27-page decision, the ALJ crafted a highly restrictive RFC for sedentary work with many limitations geared specifically towards the stress. And in crafting the RFC, the ALJ looked to what the appellant's treating sources were saying. At page 33, ALJ accords great weight to N.P. Erwin's statement that the issues were caused by stress and she would be able to work in a less stressful position. At page 35 of the record, the ALJ said they considered Duenius's opinion that appellant was not precluded from all work when fashioning the RFC. And not only did they listen to what the treating sources were saying, they listened to what the appellant herself was saying. As the ALJ notes at page 32 of the record, the objective medical evidence related to claimant's mental impairments indicates that the claimant has difficulty dealing with stress, primarily triggered when performing complex tasks, making decisions, handling changes in the setting. And if you look to the record, this is pretty much borne out. At 8.02 of the record in December 2016, she complains of stress involved in making decisions. Any mistake in her department could be harmful to the school district itself. And in October of that year, she said she was overwhelmed, work was chaotic. All right, so what does the ALJ do? We have evidence here. The stress of changes, of having to make important decisions, she can't handle this. So in the RFC, simple work-related decisions is all she's going to do, simple repetitive tasks, few changes. And similarly, the ALJ noted that appellant said she had problems getting along with bosses and people in authority. Specifically in the function report at page 226, she says she has trouble remembering what her bosses are saying. At 5.16 of the record, she noted in September 2016, she was specifically complaining about a new micromanaging boss. All right, so what does the AL do? She has issues with bosses, people in authority. So RFC limits her to short interactions with supervisors and coworkers. The RFC completed here by the ALJ did actually a very good job of looking at what the treating sources were saying, what appellant was saying, and then crafting an RFC that fit her specific needs. And what's more, the record essentially provides us with evidence that Duenius and Irwin were correct. The reason we're dealing with a closed period here is because appellant was able to go back to work in June of 2018 to a job she herself described as not challenging, boring, and quiet.  And in six months of working there, she missed three days of work. That's at 65 and 66 of the record. So again, the commissioner is not asserting that she does not experience limitations related to these headaches and these mental-emotional issues, only that she is able to work despite these limitations. Indeed, when she returned to work in June of 2018, her symptoms and limitations did not disappear. On three occasions, July 12th, July 24th, and October 2nd of 2018, she complained of her migraines worsening. And these worsening migraines, they probably would have prevented her from working in that stressful job she was in in 2016 and 2017. But when she's saying I'm having worsening migraines, she's working this new job, this quiet, boring, not challenging job where she only missed three days in six months. And similarly, if you look to the progress reports which track her mental-emotional symptoms, this is at Exhibit 34F, there's 13 progress reports through all of 2018. There's nine from January to May, and there's four after she returned to work from June to November. And it's rating her symptoms on a scale of zero to five, zero being nothing, five being the worst. And if you look at her symptoms, and the ALJ even noted this at page 32 of the record, we noted no real issues with concentration. Before she returns to work, she's rating her decrease in concentration at mostly zero. After she returns to work, those four, again, we're looking at mostly zeros. She had two zeros and two threes. So not a huge drastic change from May to June, yet she is able to work. Her condition is relatively static, and this static condition she's experiencing prevents her from working in a high-stress situation. But it does not prevent her from working in a low-stress situation, which is borne out by the fact that in June she was able to work a boring job despite the continuation of her symptoms. Are there any questions? Thank you, counsel. I'll conclude. Thank you. Mr. Kiser, you have three minutes. I'm sorry, Mr. Gorton. That's all right, and I probably won't need three minutes. I do want to address what counsel started, that it's not a matter that the plaintiff preclude one specific job. He's correct. With the residual functional capacity that the judge drew, this is what she could do, this is what she could not do. During these 18 months, the vocational experts said out of all the jobs available, there were only two that she could do. And that's on page, forgive me, it's on page 3738 of the index. And those two were the document preparer and the inspector. That's it. So the question not is whether there were other jobs. The question is whether she could do those two jobs. The question is not whether she would never have an absence, whether she would do better in those jobs. The question is during the 18 months, during the period before the family issues resolved, would she have been able to do it? And the vocational experts said no, again, I don't mean to belabor the point, if there's more than one absence or 10% off task. As counsel for the government indicates, even after she went back to work, even after she got better, even when she got better, she was close. She missed three days out of six months. She was close, but she got better. It is to her credit that when she got a little bit better, she went back to work. It is to the position of the United States that people on disability should be encouraged, if they get a little bit better, to try to go back to work. And that's exactly what she did. But the evidence is clear that during those 18 months, it was a number of stressors, as set forth way back in her childhood, that this tended to exacerbate because unlike us, she couldn't handle it. And for these 18 months, she couldn't, and to her great credit, even in the months before she stopped working, her absenteeism was beyond one day a month. It doesn't matter because her what we call SGA recruited her from getting disability. But during those 18 months, the judge found zero absenteeism. As the government says, even when she's better, she's missing almost one day a month. During those 18 months, it certainly wasn't zero. Every single doctor said it wasn't zero, and it exceeded one day a month. At a minimum, the matter should be remanded for proper consideration. Thank you. Thank you, counsel. Thank you to you both for your briefs and arguments. The four cases on today's calendar are submitted.